UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

BARBARA A. MAKARAUSKAS,

                    Plaintiff,

-vs-                                                    Case No. 6:05-cv-1088-ORL-KRS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.
_____

ORDER

This cause came on for consideration without oral argument on the Complaint

filed by Barbara A. Makarauskas[1] seeking review of the final decision of the

Commissioner of Social Security denying her claim for social security benefits.  Doc. No.

1.  The Commissioner answered the Complaint and filed a certified copy of the record

before the Social Security Administration (SSA).  Doc. No. 6.  Pursuant to the consent of

the parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c).

Doc. No. 8.

I.      PROCEDURAL  HISTORY.

In October 2001, Makarauskas applied for disability benefits under the Federal

Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*.,

_____

            [1]        Makarauskas is occasionally referred to in the medical records as Barbara
Renn.

and under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq.* (sometimes collectively referred to herein as the Act). The applications alleged that Makarauskas became disabled on January 30, 2001.  R. 58-60, 347-48. Makarauskas's applications were denied initially and on reconsideration.

Makarauskas requested a hearing before an administrative law judge (ALJ).  R. 342.  An ALJ held a hearing on June 15, 2004.  Makarauskas, represented by a person who was not an attorney, testified at the hearing. Susanna Roche, a vocational expert (VE), also testified.  R. 349-88.

After considering the testimony and the medical evidence presented, the ALJ determined that Makarauskas was insured under OASDI through September 9, 2004, the date of the ALJ's decision.  R. 22-23. The ALJ found that Makarauskas had not engaged in substantial gainful activity since the alleged onset date of her disability. R. 22.

The ALJ concluded that the medical evidence showed that Makarauskas had hypertension, obesity, degenerative disc disease of the lumbar spine, a partial right rotator cuff tear, affective and anxiety-related disorders, and that she had had a lumbar laminectomy, left shoulder arthroscopy, and foot surgeries, which were severe impairments.  These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[2]  R. 19.

---

[2]      The Code of Federal Regulations "contains a Listing of Impairments . . . specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391

The ALJ found that Makarauskas had the residual functional capacity (RFC) to do sedentary work, specifically the following: "lift 25 pounds to chest and 10 pounds overhead, stand/walk two hours of an 8-hour workday, and sit without restrictions."  R. 20.  She was "capable of understanding and following simple instructions, sustaining concentration for simple tasks, demonstrating socially appropriate behavior, and of performing simple repetitive tasks for a full day and week . . . ."  R. 20.

In reaching this conclusion, the ALJ gave greater weight to the opinions of Drs. Sanchez and Winters, who were treating physicians, over the opinion of Dr. Cole, a consulting physician.  The ALJ noted that the medical records reflect that Makarauskas's foot problems resolved after surgery and there was no medical requirement that she use a cane thereafter. The ALJ also observed that Makarauskas's activities of daily living were consistent with sedentary work.  In this regard, the ALJ wrote as follows:

> The ability to perform sedentary work is consistent with the claimant's daily activities that include walking the dog, church activities, crafts work, working on the computer, and managing the family finances. . . . [Makarauskas] was noted to be cooperative with the health professionals in the record and she has indicated that she is active in her church, reads the Bible, drives, manages the family finances, interacts with her neighbors and works on a computer.

R. 20.

Because Makarauskas's past relevant work required more than a sedentary level of exertion, the ALJ concluded that Makarauskas could not return to her past relevant

F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Pt. 404, Subpt. P, App. 1.

work.  R. 21.  Relying on the testimony of the VE and considering the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, as a framework, the ALJ concluded that Makarauskas could work at the unskilled sedentary job of food and beverage order clerk, or at the semi-skilled sedentary job of referral and information aid, both of which existed in significant numbers in the national economy.  R. 21-22. Therefore, the ALJ concluded that Makarauskas was not disabled.  R. 22.

Makarauskas requested review of the ALJ's decision. R. 10.  On October 21, 2004, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 6-8.   The Commissioner does not assert that Makarauskas's complaint was not timely filed.  *Cf.  Stone v. Heckler*, 778 F.2d 645, 649 n.7 (11th Cir. 1985)(sixty-day time period for filing civil complaint is not jurisdictional).

## II.    JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Makarauskas's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. §§ 404.981, 416.1481.  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.   STATEMENT OF FACTS.

*A.     Makarauskas's Testimony and Written Statements.*

Makarauskas was born on June 9, 1960.  R. 58.  She graduated from high school and attended two years of college.  R. 72.

Makarauskas previously worked as a caterer and as a clerk in a bookstore.  R. 356, 380.  She also worked as a waitress and at a plastics factory.  R. 356.

At some point, Makarauskas fell and injured her back.  R. 356.  She had difficulty walking due to many surgeries on her back and feet.  R. 357-58.  Dr. Broom was treating her back problems, but she had not seen him since 2003 because he would not accept her insurance.  R. 354. Drs. Sanchez and Estrada treated her for problems with her feet.  R. 358.

Makarauskas had arthritis in her knees.  She believed that she had a rotator cuff tear in her shoulder for which she was being treated by Dr. Winters.  R. 353, 362.  She also indicated that she had carpal tunnel syndrome in her left arm and wrist.  R. 367.

Makarauskas suffered from depression, anxiety, and panic attacks.  R. 358, 368.  Medication helped with these conditions but did not completely relieve them.  R. 369.  It was hard for her to be in a new place or to drive to a place with which she was not familiar.  R. 358.  She had difficulty with long term memory, R. 113, and difficulty sleeping. R. 116.

Makarauskas had daily lower back pain that radiated through her buttock into her thighs.  She had muscle spasms in her right leg and calf.  She also had pain in her feet, especially on the right, and numbness on the outside of the foot.  R. 363-64.  Her feet swelled.  R. 364.  She had difficulty feeling her right foot, and she dragged her right foot when walking.  R. 364, 371.  She used a cane at the hearing.  R. 364.  She could not stand for extended periods.  R. 365.  She also had right shoulder pain radiating down her arm and into her back.  R. 367.

Makarauskas estimated that she could sit for about ten minutes before having pain in her back, legs and shoulders.  She could stand five to ten minutes before her feet hurt.  She could not lift a gallon of milk or lift ten pounds overhead.  R. 370.  She could

not lift her grandchildren.  R. 371.  She was able to drive, but she did so only in case of

an emergency.  R. 357.  The numbness in her right foot made it difficult for her to drive.

R. 372.

She used a stool to take a shower and a walker to help her get in and out of the

bathtub.  She slept downstairs in her home because it was difficult for her to climb the

stairs.  R. 372.

In an average day, she awoke around 5:00 a.m.  Her companion made her coffee

and helped her get dressed.  During the day she would read novels or do her Bible

studies.  Women from her church visited her because she was no longer able to attend

Wednesday Bible studies or Sunday church services.  R. 112, 373.  On "bad days,"

when she suffered headaches, she tried to sleep during the day.  R. 374.  Her

companion and her son did the laundry, cooking, and grocery shopping.  R. 375.

B.    *Vocational Expert Testimony.*

The ALJ asked the VE to assume a variety of hypothetical claimants.

R. 383-86.  The VE opined that a person limited to sedentary work with limitations on

lifting twenty pounds to chest level and five pounds overhead who was able to

understand and follow simple instructions, sustain concentration for simple tasks, behave

in a socially acceptable manner, and perform simple, repetitive tasks for a full day on a

weekly basis would not be able to perform Makarauskas's past relevant work.  R. 383-

87.

The VE opined that this hypothetical claimant could perform the job of food and

beverage order clerk and hand addresser, both of which were sedentary unskilled jobs

that existed in significant numbers nationally.  She could also be a referral and

information aide, which is a sedentary, low semi-skilled position that existed in significant numbers nationally.  R. 386-87.

C.    *Medical Records.*

1.    <u>Physical Condition.</u>

**a.    Neck, Back, Shoulder and Related Pain.**

Makarauskas was treated by Michael J. Broom, M.D., beginning sometime before February 25, 2000, for back, leg, and neck discomfort and tingling and numbness in her fingers and hands.  She reported that she was being evaluated by other doctors for carpal tunnel syndrome.  In February 2000, Dr. Broom prescribed use of wrist splints and Vioxx as well as epidural steroid injections.  R. 172.  Treatment notes dated April 18, 2000, reflect that Makarauskas was then taking Vicodin, and Dr. Broom recommended use of a TENS unit.  R. 171.

W. Clark Davenport, M.D., examined Makarauskas in March 2000 for complaints of numbness and tingling in both hands.  Examination revealed a positive Phalen's test[3] on the left, but negative tests on the right. She also had some numbness in the little finger of her left hand.  Dr. Davenport's assessment was bilateral carpal tunnel syndrome.  He recommended that she use the wrist splints prescribed by Dr. Broom and ordered a nerve conduction velocity study.  R. 251. It does not appear that the nerve conduction velocity study was performed.  R. 252.

In August 2000, Donna Lester, M.D., treated Makarauskas for hypertension and depression.  R. 129.  Her records reflect that Makarauskas had a laminectomy in 1988

---

[3]    "The reproduction of the symptoms of carpal tunnel syndrome by hyperflexing the wrist." *Casher v. Halter*, No. Civ.A. 00-0110-AH-L, 2001 WL 394921, at *5 n.4 (S.D. Ala., Mar. 29, 2001).

and a disectomy with fusion in 1991.  R. 130.

In January 2001, during her yearly follow-up visit with Dr. Broom, Makarauskas reported that she had increased pain in her right shoulder, back, and right leg.  Dr. Broom noted some tenderness on palpation.  X-rays showed the previous spinal fusion to be solid.  He continued to treat her with medication, a TENS unit, and he recommended a home exercise program.  R. 170.

In May 2001, Makarauskas advised Dr. Broom that the pain in her back, left buttock, and left leg was intolerable.  An MRI revealed a questionable herniated disc.  R. 169, 174.  Dr. Broom administered a lumbar epidural steroid injection.  R. 168.

In June 2001, Daniel Farrell, M.D., examined Makarauskas for complaints of shoulder and neck pain.  Upon examination, he noted limited range of motion and pain on palpation.  R. 214.  An MRI showed no significant rotator cuff tear, but there appeared to be a partial tear elsewhere, as well as fluid collection.  Thomas A. Csencsitz, M.D., an associate of Dr. Farrell, opined that this was possibly related to an impingement syndrome.  He recommended physical therapy.  R. 213.  He limited Makarauskas to lifting no more than twenty pounds with the right upper extremity and no overhead activities.  R. 212.

Makarauskas returned to Dr. Csencsitz for a follow-up visit in August 2001.  She indicated that her pain was unchanged and that she had not attended physical therapy for personal reasons.  She also reported neck pain but no tingling or numbness in her arms or hands.   She experienced pain on motion.  Her strength and sensitivity to touch were good.  Physical therapy was still prescribed with the same exertional limitations as previously indicated.  R. 207-08.

In July 2001, an MRI of Makarauskas's right shoulder revealed a partial thickness tear of a muscle and tendon with a moderate sized osteophyte at the acromioclavicular (AC) joint.  R. 132.

Tom Winters, M.D., examined Makarauskas on October 3, 2001, for pain in her right shoulder and neck discomfort.  Dr. Winters prescribed an injection to relieve the pain and permitted her to perform full lifting to chest level and lifting up to ten pounds overhead.  R. 126.

On October 11, 2001, Makarauskas again returned to Dr. Broom complaining of back pain radiating into her left hip and leg, as well as increasing pain in her neck and shoulders.  Examination confirmed that Makarauskas had pain and tenderness with limitation on range of motion.  Dr. Broom again administered epidural steroid injections. R. 167.

On October 30, 2001, J. Dean Cole, M.D., performed an independent medical examination on Makarauskas.  At that time, she complained of right shoulder and neck pain.  She also reported depression, insomnia, and frequent headaches.  R. 140.  Dr. Cole noted that Makarauskas came to the appointment alone.  She walked with a cane and wore slippers due to surgery on her feet.  He observed that she was overweight.  R. 139.

Upon examination, Dr. Cole noted that Makarauskas had no atrophy or deformity in her hands or wrists.  Sensitivity to touch tests were inconclusive due to marked discrepancies in Makarauskas's response to the test.  Her strength was good.  Her elbow had normal range of motion.  She reported pain on palpation of the right shoulder with limitation on range of motion.  An MRI showed that she had a normal rotator cuff.  R.

139.  Dr. Cole's assessment was that Makarauskas had a preexisting condition of AC joint arthritis.  He recommended that she avoid overhead lifting, heavy pulling or pushing greater than twenty-five pounds, and climbing.  He felt that Makarauskas could perform activities requiring use of her right upper extremity below chest height with limited range.  R. 138.

In December 2001, Makarauskas continued to complain of pain that was not eased with Vicodin.  Dr. Broom prescribed a morphine-type medication called Kadian.  R. 166.

Dr. Winters administered a second injection for shoulder pain in January 2002.  At that time, Dr. Winters did not impose any functional limitations arising from Makarauskas's shoulder problem.  R. 125.

In February 2002, Makarauskas reported to Dr. Winters that her left shoulder was uncomfortable with movement.  Dr. Winters also continued to treat her for pain in her right shoulder.  R. 244.  In April 2002, Dr. Winters observed from an MRI a full-thickness tear in a tendon in Makarauskas's left shoulder and degenerative changes and fluid in the AC joint area.  He recommended surgery on the left shoulder.  R. 245.  He continued to impose restrictions of lifting in the range of twenty pounds to chest level and no overhead lifting.  R. 244-45.  A cervical MRI dated in April 2002 revealed mild bulges in Makarauskas's cervical spine, but no herniation.  R. 173.

In October 2002, Luis J. Sanchez, D.P.M., Makarauskas's podiatrist, wrote that Makarauskas was experiencing back pain.  He noted that Makarauskas was no longer required to use a cane to walk, although she still used it when necessary due to back pain.  He opined that Makarauskas could walk up to two hours a day.  R. 194.

On October 18, 2002, Max B. Medary, M.D., advised Dr. Broom that, based on MRIs, he found no central disc herniation or stenosis and good fusion in Makarauskas's lumbar spine, although with some canal decompression.  R. 272.

In October 2002, Makarauskas returned to Dr. Csencsitz for follow-up.  She reported that physical therapy improved the range of motion of her right shoulder.  She also reported that she had a tear in the left shoulder.  She complained of pain in her knees, but Dr. Csencsitz determined that x-rays revealed no knee abnormalities.  R. 206.  Dr. Csencsitz opined that, with respect to her shoulder impairment, Makarauskas could return to work without restrictions.  R. 205.

Melody Brayross, M.D., treated Makarauskas for ankle and joint pain beginning at least by June 2003.  Her initial impression was that Makarauskas suffered from degenerative arthritis.  R. 330.  Dr. Brayross also noted that Makarauskas had hypertension, controlled through medication, and that she was obese with hypercholesterolem.  R. 325-28.  Dr. Brayross prescribed Percocet, Lortab and Vioxx for pain.  R. 323, 328.

Dr. Winters performed arthroscopic surgery on Makarauskas's left shoulder in August 2003.  He also noted that an MRI of Makarauskas's knee showed minimal join effusions and minimal mucoid degeneration with pain on movement.  R. 241.

In September 2003, Makarauskas also complained of shoulder pain following surgery.  Dr. Brayross prescribed additional pain medication.  R. 316.

As of October 30, 2003, Dr. Winters released Makarauskas to work with lifting in the range of twenty pounds to chest level and five pounds overhead.  R. 236-37.  In December 2003, he changed these restrictions to permit Makarauskas to lift in the range

of twenty-five pounds to chest level and ten pounds overhead.  R. 235.

On October 28, 2003, Victor Robert, M.D., a neurologist, examined Makarauskas. She complained of pain and tenderness in her right foot with numbness and tingling.  Dr. Roberts wrote that Makarauskas did not appear to be depressed.  He observed that she walked with a slight limp.  Upon examination, he found that Makarauskas's muscle power was good, with no atrophy, and no consistent sensory loss, but with complaints of tenderness.  Dr. Robert opined that Makarauskas's problems were not neurologically based.  R. 274.

In December 2003, Makarauskas reported to Dr. Brayross that she was doing well with medications.  R. 313.

In June 2004, Makarauskas reported morning stiffness and pain that improved when she walked.  Dr. Brayross added a prescription for an NSAID for pain.  R. 299. Makarauskas also complained of back pain radiating into her legs with numbness in the right leg.  R. 297.  A CT scan showed moderate to severe stenosis (narrowing) in the lumbar spine.  R. 294.  Dr. Brayross added a muscle relaxant and Dilaudid to Makarauskas's medications.  R. 296.

### b.    Foot Pain.

Beginning at least by August 2000, Luis J. Sanchez, D.P.M., began treating Makarauskas for problems with her feet.  Makarauskas also complained of heel pain due to plantar fasciitis.  R. 270.  Dr. Sanchez recommended that she have bunion surgery on her left foot.  R. 270.

In January 2001, Makarauskas continued to complain of pain due to chronic plantar fasciitis, heel bursitis and Achilles tendinitis.  R. 269.  At that time, however, she

told Dr. Sanchez that she was working two jobs and was very active on her feet.  R. 268-69.

Dr. Sanchez performed surgery on Makarauskas's left foot in March 2001.  R. 263.  Dr. Sanchez reported that Makarauskas recovered from this surgery with excellent results in relieving the pain in her left foot.  R. 260.  Dr. Sanchez performed surgery on Makarauskas's right foot in June 2001.  R. 257-59.  In November 2001, Makarauskas reported that hardware from the surgery on her right foot was causing pain.  Later in the month, Dr. Sanchez  performed surgery to correct this problem.  R. 200.

On January 31, 2002, Dr. Sanchez performed additional surgery on the right foot.  R. 203.  After this surgery, he recommended that Makarauskas continue not to bear weight on her foot as much as possible.  R. 198. In April 2002, Makarauskas reported that the pain had ameliorated.  Dr. Sanchez permitted Makarauskas to walk with a surgical shoe and use of crutches or a cane.  R. 197.  Dr. Sanchez also noted that Makarauskas's left foot had healed well with no pain.  R. 196.

Robert Estrada, D.P.M., began treating Makarauskas on August 15, 2003.  She complained of persistent numbness and burning in her right foot and ankle.  R. 283.  Radiological tests disclosed plantar fascial/fibromatosis, a calcaneal bone spur and neuritis neuralgia.  R. 282.  Dr. Estrada performed surgery in early 2004.  R. 280.  In May 2004, Dr. Estrada wrote that Makarauskas was doing well and could increase activities as tolerated.  R. 276.

### c.      Generalized Pain Management.

Douglas A. Conigliaro, M.D., examined Makarauskas on May 27, 2004, for pain management.  He noted that Makarauskas was 5'4" tall and weights 226 pounds.  She

carried a cane.  Upon examination, Dr. Conigliaro observed that Makarauskas had slightly decreased range of motion in her neck and good motor strength, sensation, and reflexes in her upper and lower extremities.  She had diffuse tenderness throughout her back.  His impression was chronic low back pain, diffuse arthralgias, anxiety and depression, obesity and deconditioning and chronic opioid use, among other things noted by history.  Dr. Conigliaro recommended continued psychiatric care, gradual weight loss, and increased activity.  R. 288-91.

        2.    Mental Condition.

    Beginning at least by January 29, 2001, Makarauskas was treated by A. Canaan, M.D., for mental health problems.  R. 136-37.  On January 11, 2002, Dr. Canaan diagnosed Makarauskas with a panic disorder, generalized anxiety disorder, and major depression, with a global assessment of function (GAF) of 59.[4]  R. 135.

    In January 2002, William W. Austin, Psy.D., examined Makarauskas at the request of the SSA.  Makarauskas drove herself to the examination.  She used a cane to walk.  She complained of lack of motivation, crying spells, depressed mood, general malaise, nervousness, sweating, shaking, and feelings of impending doom.  She reported that her panic attacks had been reduced to three to four times per week.  She told Dr. Austin that during the day she would read, do crafts, work on the computer, manage her finances, and watch television.  On a good day she was able to walk the

_____

    [4] The Global Assessment of Functioning ("GAF") scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for himself).  *Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition* 32 (4th ed. 1994) (hereinafter the "DSM-IV").  A score between 51 and 60 is defined as moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id.* at 32.

dog.  She also meditated and studied her Bible and socialized with neighbors and neighborhood children.  She attended church regularly and shopped at K-Mart.  R. 143-42.

Dr. Austin observed that Makarauskas's attention and concentration were sustained throughout the evaluation and that her thought processes were linear.  Her mood was anxious, but her affect was full range.  Dr. Austin's assessment was that Makarauskas had a chronic major depressive disorder and a panic disorder without agoraphobia.  R. 142.

In May 2002, during a follow-up examination by Dr. Canaan, Makarauskas continued to report panic attacks, anxiety, and nightmares.  However, she had stopped taking Paxil for a time, which she admitted affected her.  Dr. Caanan's assessment remained substantially the same as his assessment in January 2002.  He continued Makarauskas on medication.  R. 134.

In May and June 2003, Makarauskas told Dr. Brayross that she felt depressed and anxious with crying, insomnia, and loss of appetite.  R. 324, 328.  Dr. Brayross diagnosed a depressive disorder and prescribed Xanax, Zoloft, and Klonopin.  R. 323, 328.

S.V. Joseph, M.D., Ph.D., began treating Makarauskas in June 2003.  Treatment notes from June 2003 reflect that Makarauskas reported having good results with medication with no side effects.  Dr. Joseph wrote that her mood was less depressed and her affect was appropriate.  R. 246.  Dr. Joseph's assessment was major depression, moderate.  R. 247.  In December 2003, Dr. Joseph again wrote that Makarauskas's mood was less depressed and her affect was appropriate.  R. 248.  In

May 2004, he wrote a note asking that Makarauskas be excused from attending very public environments like Disney World due to an anxiety disorder.  R. 249.

In June 2004, Dr. Joseph completed a questionnaire in which he indicated that Makarauskas would have moderate limitations in carrying out short, simple instructions and marked limitations in the ability to understand, remember and carry out detailed instructions and make judgments on simple work-related decisions.  R. 292.  She would also have moderate limitations in her ability to interact appropriately with the public, supervisors, and co-workers and extreme limitations in responding appropriately to work pressures in a usual work setting.  R. 293.

> D.    *Reviewing Professionals.*

> 1.    Physical Functional Capacity Assessments.

M. delaCerna, M.D., prepared a physical RFC assessment after reviewing Makarauskas's records.  Dr. delaCerna opined that Makarauskas could lift twenty pounds occasionally and ten pounds frequently.  She could sit, stand or walk about six hours during an eight-hour workday, with no other functional limitations.  R. 157-64.

On December 19, 2002, Gloria B. Hankins, M.D., prepared a physical RFC assessment based on a review of Makarauskas's medication records.  Dr. Hankins concurred with Dr. delaCerna's RFC assessment.  R. 227-34.

> 2.    Mental Functional Capacity Assessments.

Cheryl Woodson Johnson, Psy.D., completed a Psychiatric Review Technique form after reviewing Makarauskas's records in March 2002.  Dr. Johnson opined that Makarauskas did not have any severe mental impairments.  R. 144.  She concluded that Makarauskas would have only mild limitations in activities of daily living, maintaining

social functioning, and maintaining concentration, persistence or pace.  R. 154.

In September 2002, Nancy Dinwoodie, M.D., completed mental RFC forms after reviewing Makarauskas's records.  She opined that Makarauskas had major depression and a panic disorder that resulted in mild restrictions of daily living and social functioning, as well as moderate difficulties in concentration, persistence and pace.  R. 180-93.  She concluded that Makarauskas would be moderately limited in the following abilities: carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; and responding appropriately to changes in the work setting.  R. 176-79.

## IV.     STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987) (per curiam).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395

F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal

standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42

U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla,

and must do more than create a suspicion of the existence of the fact to be established.

It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir.

1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence

favorable as well as unfavorable to the [SSA's] decision."  *Chester v. Bowen*, 792 F.2d

129, 131 (11th Cir. 1986).  Where the SSA's decision is supported by substantial

evidence, the court will affirm, even if the court finds that the proof preponderates

against the decision.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence

or substitute its own judgment.  *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such

presumption attaches to the ALJ's legal conclusion about the proper standards to be

applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision

fails to provide the court with sufficient reasoning to determine that the SSA properly

applied the law.  *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th

Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to

"enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without

remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## V.      ANALYSIS.

Makarauskas contends that the ALJ did not consider all of the evidence, arguing

that she did not rely upon the records of Drs. Broom, Brayross, and Estrada in

determining her physical RFC, and did not discuss her complaints of pain in both knees.

She also argues that the ALJ erred by failing to give controlling weight to the opinion of

Dr. Joseph regarding her mental impairments.  These are the only issues I will address.[5]

A.      *Substantial Evidence Supports the ALJ's Physical RFC Assessment*.

Makarauskas properly concedes that the ALJ discussed both Dr. Broom and Dr.

Brayross's medical records in her opinion. *See* Doc. No. 16 at 18 nn. 33 & 34.  She

contends, however, that the ALJ erred because she did not write that Makarauskas

complained of pain to Dr. Broom, she did not reflect Makarauskas's complaints of knee

pain, and she did not expressly state that she relied on the opinions of Dr. Broom and Dr.

Brayross in reaching her physical functional capacity assessment.

The Commissioner correctly argues that "there is no rigid requirement that the ALJ

specifically refer to every piece of evidence in his decision, so long as the ALJ's decision

. . . is not a broad rejection which is 'not enough to enable [the district court or the

appellate court] . . . to conclude that [the ALJ] considered her medical conditions as a

whole.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)(quoting *Foote v. Chater*,

---

[5]      The parties were advised that issues not specifically raised would be waived.  Doc. No. 9 at 2.  I note that Plaintiff's memorandum of law is difficult to read because of the many arguments asserted in footnotes and the grouping of various issues under the single argument that the ALJ failed to consider all of the relevant evidence.  As such, Makarauskas cannot fairly argue that she specifically asserted a claim not discussed in this order.

67 F.3d 1553, 1561 (11th Cir. 1995)). The ALJ's decision in this case reflects a careful review of the evidence sufficient to enable this Court and an appellate court to understand the basis of her decision and the law applied.

Furthermore, as the Commissioner argues, it is unclear what additional limitations Makarauskas contends would apply had the ALJ specifically cited to Dr. Broom and Dr. Brayross's records or specifically recited Makarauskas's complaints of knee pain in reaching her physical RFC determination.  The RFC determination was limited to sedentary work, which by definition requires little need to stand or walk.  Makarauskas does not cite any opinion rendered by Dr. Broom, Dr. Brayross, or other physicians to whom Makarauskas complained of knee pain indicating that her functional capacity was less than the physical RFC determined by the ALJ.

Similarly, Makarauskas argues that the ALJ erred in basing her physical RFC assessment on the opinion of Dr. Sanchez because Dr. Estrada performed additional surgery on Makarauskas's feet after Dr. Sanchez rendered his October 2002 RFC assessment.  Once again, the ALJ's decision specifically reflects that she was aware of the surgery performed by Dr. Estrada in 2004.  *See* R. 18.  The ALJ correctly noted that Dr. Estrada's notes after the surgery indicate that Makarauskas was making excellent improvement.  *Id.*  Indeed, Dr. Estrada wrote in May 2004 that Makarauskas could increase her activities.  R. 276.

The ALJ's decision reflects that she gave careful consideration to the record as a whole.  She articulated specific reasons for reaching her conclusion about Makarauskas's physical RFC, which are supported by substantial evidence in the record. Accordingly, Makarauskas's first assignment of error is unavailing.

B.    *Substantial Evidence Supports the ALJ's Mental RFC Determination.*

Makarauskas also asserts that the ALJ erred by giving lesser weight to the opinion of Dr. Joseph, one of her treating physicians, regarding her mental functional capacity. The ALJ explained that she gave lesser weight to Dr. Joseph's opinion because it was "'extreme, inconsistent with the evidence in the record, and . . . not supported by his own records.'" R. 20.  She further noted that while Dr. Joseph diagnosed Makarauskas with major depression, moderate, his progress notes reflected that Makarauskas's mood was less depressed and that her affect was appropriate as of September 2003 and December 2004.

The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2)).  Good cause has been found "where the doctor[s'] opinion[s] [were] not bolstered by the evidence, . . . where the evidence supported a contrary finding[,] . . . [or] where the doctors' opinions were conclusory or inconsistent with their own medical records." *Id.* (internal citations omitted).  The ALJ must articulate the reasons for giving less weight to the opinion of a treating physician.  *Id.*  However, the ultimate determination of whether a claimant qualifies for disability under the Act is made by the SSA.  20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1).

The ALJ's stated reasons for giving lesser weight to Dr. Joseph's opinion are supported by the record.  His treatment notes reflect that Makarauskas was doing well on medication, indicating her mood was less depressed and her affect was appropriate, which is inconsistent with his statement on the RFC assessment that Makarauskas's

condition had not responded adequately to treatment.  R. 292.

Furthermore, as the ALJ noted, Dr. Joseph's assessment was inconsistent with the record as a whole.  While Makarauskas complained of depression and panic attacks, she was still able to socialize at church and with friends and to concentrate sufficiently to read, engage in Bible studies and attend to the family finances.  There are indications in the record that she drove herself to various doctors' appointments.  There is no indication of a panic or anxiety attack suffered while going to new places for examination or treatment.

Finally, the ALJ credited the opinions of the treating and consulting doctors, including Dr. Joseph, with respect to Makarauskas's ability to perform work requiring only simple, repetitive tasks.

The ALJ applied the correct legal standard in assessing the weight to accord to Dr. Joseph's opinion.  She articulated adequate reasons, supported by substantial evidence, for giving lesser weight to Dr. Joseph's opinion, which is sufficient to establish good cause for her determination.  Accordingly, this assignment of error is also unavailing.

**VI.   CONCLUSION.**

For the reasons set forth herein, it is **ORDERED** that the decision of the

Commissioner is **AFFIRMED**.  The Clerk of Court is directed to issue a judgment

consistent with this Order and, thereafter, to close the file.

DONE and ORDERED this 28th day of September 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE